**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**T. Windle DYER, Defendant-Appellant.**

No. 83–3249.

United States Court of Appeals,
Fifth Circuit.

Dec. 27, 1983.

Alan Ellis, Philadelphia, Pa., for Amicus-Nat'l. Assoc. Crim. Lawyers.

John P. Volz, U.S. Atty., Marilyn Gainey Barnes, Harry W. McSherry, Robert J. Boitmann, Asst. U.S. Attys., New Orleans, La., for plaintiff-appellee.

Before GARZA, WILLIAMS and HIGGINBOTHAM, Circuit Judges.

HIGGINBOTHAM, Circuit Judge:

## I

Attorneys Stephen Dwyer and Arthur Lemann, III, were subpoenaed by a New Orleans Grand Jury to testify concerning conversations with their client, T. Windle Dyer. Dyer claims that the subpoenas should be quashed because the conversations are protected under the attorney-client privilege. The district court after an evidentiary hearing rejected Dyer's claim of attorney-client privilege pointing to the crime or fraud "exception" to the privilege. We affirm in part and reverse in part.

In April 1982, the Maison Charles, a housing project chartered by Guy Olano and zoned for condominium use, petitioned the New Orleans Planning Commission for zoning as a time share project. This petition was denied. Soon thereafter Dyer became a member of the Commission. At Dyer's first meeting as a member of the Commission, the Commission voted to reconsider its earlier denial of the Maison Charles' petition.

The Commission recommended that the Maison Charles be rezoned as a time share project and within two months the New Orleans City Council granted zoning approval to the Maison Charles for time sharing subject to Olano's compliance with certain conditions. Before appointment to the Planning Commission, Dyer acquired an interest in a different real estate venture, the

Algiers Point Project. Dyer knew Guy Olano, who was also chairman of the board of a local bank. Throughout this period, roughly the summer of 1982, Dyer and Olano discussed Olano's difficulties in securing zoning approval for the Maison Charles. They also discussed the possible financing of Dyer's Algiers Point Project by Olano's bank. At some point in these events, Olano became an FBI informant and began to tape their conversations.

On November 1, 1982 Dyer received a commitment letter from Olano's bank good until November 15, 1982 to finance the Algiers Point Project. On November 9, 1982 Olano paid Dyer twenty-five thousand dollars. On the evening of November 15th, Dyer and his civil attorney Dwyer approached Lemann, an attorney specializing in criminal practice in New Orleans. The following day, November 16, Dwyer delivered to Olano's office a letter which returned twenty-five thousand dollars. The letter did not mention the Maison Charles but explained that the money was being returned because of developments in the Algiers Point Project. On November 17 Dyer had a telephone conversation with Olano, who apparently had not received the letter. In this conversation, which Olano also recorded, Dyer denied that he had corrupted other officials in connection with the Maison Charles' rezoning. Dyer stated that he had been conducting an investigation of people who might be corrupting public officials and had tested Olano to see how hesitant he was to pay Dyer to receive zoning approval. Dyer explained to Olano that he had returned Olano's money because he was satisfied that Olano was not the sought corrupting force.

A federal grand jury in New Orleans returned a one count indictment against Dyer on December 2, 1982, charging a violation of the Hobbs Act, 18 U.S.C. § 1951. The indictment alleged that Dyer used his official position to extort $25,000 and to procure a financing commitment for the Algiers Point Project.

The government asserts that it may ask for a superseding indictment against Dyer to add a count of obstruction of justice under 18 U.S.C. § 1512, based on Dyer's effort to return the $25,000 accompanied by the November 16 letter. On April 8, 1983 the grand jury issued subpoenas to Lemann and Dwyer to appear before the grand jury and testify as to the circumstances surrounding the preparation and delivery of the November 16th letter from Dyer to Olano. After a hearing at which the tape recorded conversations and letter were received into evidence, Dyer's motion to quash the subpoenas was denied by the district court. The district court found that the crime or fraud exception prevented Dyer from asserting the attorney-client privilege. Dyer appeals.

II

The government argues that the tapes convincingly show that Dyer, after violating the Hobbs Act by exacting twenty-five thousand dollars from Olano to secure approval of the Maison Charles zoning change, began to fear Olano's true motives and decided to cover up his Hobbs Act violation. The argument continues that as part of that retreat and cover up Dyer consulted his attorneys, resulting in the return of the money to Olano with a letter explaining that the money was a return of that received for the project at Algiers Point. Finally the government argues that the cover up included Dyer's telephone call to Olano in which he tried to convince Olano that he had not been serious about taking the money to corrupt officials.

The district court found at the evidentiary hearing that the tapes established at least a prima facie case that Dyer had illegally extorted the $25,000 for his support as a member of the zoning commission in connection with the Maison Charles project and that Dyer had used his attorneys to further his criminal goals by having them write the November 16th letter. The district court rejected any complicity of Dwyer or Lemann.

The findings of fact by the district court may not be set aside unless clearly erroneous. We turn to the review of the facts

and whether these facts defeat Dyer's claim of attorney-client privilege.

### III

The government argues that Dyer either failed to disclose the true purpose for the money and used his attorneys to obstruct justice or they knowingly participated in an obstruction of justice but that in either event there was no privilege.

The attorney-client privilege is cast in perpetual tension. Its purpose is to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of the law and administration of justice." *Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981). At the same time it withdraws what might otherwise be relevant evidence and it acts as an "obstacle to the investigation of the truth." 8 J. Wigmore, Evidence § 2291 (McNaughton rev. 1961). *See United States v. Pipkins,* 528 F.2d 559, 563 (5th Cir.), *cert. denied,* 426 U.S. 952, 96 S.Ct. 3177, 49 L.Ed.2d 1191 (1976).

■ The accommodation of these competing interests drives numerous limits and "exceptions" to the claim of attorney-client privilege. We here examine the "fraud or crime" exception. Where a client seeks to use an attorney to further a continuing or future crime or fraud the broader public interest in the administration of justice is being frustrated, not promoted. Thus, where the government makes a prima facie showing that the attorney-client relationship was intended to further continuing or future criminal or fraudulent activity, the privilege does not exist. *In Re Grand Jury Proceedings (Pavlick),* 680 F.2d 1026, 1028 (5th Cir.1982) (en banc); *In Re Grand Jury Proceedings (Fine),* 641 F.2d 199, 203 (5th Cir.1981); *Clark v. United States,* 289 U.S. 1, 15, 53 S.Ct. 465, 469, 77 L.Ed. 993 (1933) (dicta).

■ Professor Wigmore aptly stated the rationale and limitations behind the attorney-client privilege:

The confidences of such persons may legitimately be protected, wrongdoers though they have been, because, ... the element of wrong is not always found separated from an element of right; because, even when it is, a legal adviser may properly be employed to obtain the best available or lawful terms of making redress; and because the legal adviser must not habitually be placed in the position of an informer. But these reasons all cease to operate at a certain point, namely, where the desired advice refers *not to prior wrongdoing,* but to *future wrongdoing.*

Wigmore at § 2298 (emphasis in original). The tapes support the district court's finding that Dyer consulted with Dwyer for the purpose of obstructing justice by the creation of false evidence; that the government made a prima facie showing that the advice concerned future wrongdoing. There is no evidence however that the consultation with Lemann on the preceding day was with such a purpose. It is the letter written the day after consulting with Lemann that creates the prima facie case. That letter was written by the civil lawyer Dwyer. There is no evidence of any illegality in connection with Lemann. For all the record shows Lemann could have given the sound and legal advice to return the money. That the return was made the next day with a phony explanation of a different lawyer is not enough as to Lemann. It follows that Dyer's communication with Dwyer concerning the November 16 letter is not privileged, but the communication with Lemann is.

But, Dyer argues, the matter is not so simple. Dyer argues that the district court ruling is without principled limits and will chill vigorous advocacy. The argument continues that development of defensive theories by their nature produces acts inconsistent with the government's case; that a lawyer cannot under any theory which fails to recognize Dyer's attorney-client privilege be assured that the communication from his client will be protected from disclosure. We agree that denial of an attorney-client privilege to a person under

indictment is fraught with many of the suggested perils. It is important then that we make plain what we do not hold.

■ We hold only that when the government can by competent evidence establish a prima facie case that an attorney was being used in the commission of a crime there is no privilege. Outside the context of a pending criminal indictment and imminent trial this statement is beyond challenge. The complication stems not from the concept of a crime or fraud exception but from its use in the critical time between accusation and trial.

The indictment proves nothing. It is only the procedural trigger for the criminal process. It justifies certain restraints of a person's liberty as it is backed by a probable cause determination. It follows that for the government to defeat the privilege it may not rest on an indictment but must offer proof. But, Dyer replies, the procedure followed limited his constitutional right to remain silent; he was put to a Hobson's choice of offering responsive evidence or losing his attorney-client privilege. Dyer continues that the very threat of such a proceeding chills communication with his lawyer because it is only by giving up the confidence that he can properly respond to the government's attack on his right to the confidence. The government counters that this argument ignores the fact that a defendant faces similar choices on a motion to suppress.

Our immediate concern is accommodating the government's interest in obtaining the testimony of Dyer's attorneys with Dyer's interest in protecting his relationship with his lawyers. Concerns beyond the immediate interest of Dyer rest on both sides of this balancing scale. On the Dyer side there is a concern that the Sixth Amendment-rooted adversary system be protected in actuality, and when distinct, in appearance. That is, the government here effectively forces Dyer to hire different lawyers because it made a prima facie showing of abuse. On the other side there is the right to every person's evidence. But having said this we are persuaded that these interests

are accommodated by the procedure followed below. We are not so removed from reality as to indulge in the fantasy that all accused are truthful with their lawyers. But an inconsistency between the government's proof and an accused's version alone will not defeat or even threaten the attorney-client privilege. The line between manufacture of evidence efforts at restitution and imaginative advocacy may at times be obscure. We must be particularly cautious as that line is approached to insure that vigorous advocacy is not unfairly checked or that able counsel are not forced from cases without cause. Here there was unique proof that Dyer was creating new evidence by the writing and delivery of a letter. The district court, with the background of Dyer's words, found the letter and its delivery to establish a prima facie case of obstruction of justice. Allowing due play for the accommodation of a vigorous defense we cannot find this conclusion to have been in error.

■ The district court has abundant resources to prevent abuse. It can refuse to allow use of the evidence until its relevance has first been established and given the concerns which we have identified a district court can insist that this relevance be more than marginal. *United States v. James,* 590 F.2d 575 (5th Cir.) (en banc), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979); *United States v. Beechum,* 582 F.2d 898 (5th Cir.1978) (en banc), *cert. denied,* 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979). In this case, for example, what was told to the lawyers may not become relevant unless the November 16, 1982 letter is put into evidence by the defense. Indeed if it is the prospect of the defense's use of the November 16 letter which concerns the prosecutor we note that an offer by Dyer of the letter carries the risk of waiver, a matter we do not decide. The point is that the district judge has the power to so control the trial and the sequence of the evidence as to insure that evidence of a client's communication with his lawyer be used only after more than marginal relevance at trial is first demonstrated and only after it is

convinced that the government effort to obtain and use the evidence was in good faith and was not an abuse of the grand jury or an effort to strike at opposing counsel.

## IV

 The government acknowledges that it may use Dwyer's and Lemann's testimony concerning the letter-related conversations at Dyer's trial under the Hobbs Act count. Whether the attorney-client privilege might yet bar the admissibility of the evidence at trial is not immediately before us, but in the interest of judicial economy we pause to note that we find no rational basis for concluding that the privilege is defeated for purpose of grand jury testimony but nonetheless is resurrected at trial. We reject Dyer's contrary suggestion. When the confidence is broken the values their protection vindicated would no longer weigh in the balance against the strong policy supporting the right to every person's evidence. *See United States v. Gordon-Nikkar,* 518 F.2d 972, 975 (5th Cir.1975). Of course, if the evidence at trial persuades the trial court that the earlier established crime or fraud exception is in fact not established the privilege could be recognized.

## V

 Dyer also argues here that the subpoenas abuse the grand jury process because the obstruction of justice count is a pretext to use the grand jury to prepare its case for the Hobbs Act trial. Whatever its otherwise merit, Dyer's argument that the grand jury was being used to develop evidence to support proof of an offense for which an indictment has already been returned cannot survive the finding that the requested information was in connection with a new offense. That is, there was here a legitimate continuing investigation. *Cf. United States v. Ruppel,* 666 F.2d 261, 267–8 (5th Cir.), *cert. denied* 458 U.S. 1107, 102 S.Ct. 3487, 73 L.Ed.2d 1369 (1982); *United States v. Beasley,* 550 F.2d 261, 266 (5th Cir.), *cert. denied,* 434 U.S. 863, 98 S.Ct. 195, 54 L.Ed.2d 138; 434 U.S. 938, 98 S.Ct.

427, 54 L.Ed.2d 297 (1977). We, as the district court, find no abuse of process.

In sum, Dyer retains his privilege to block the testimony of Dwyer before the grand jury except as to the events immediately surrounding the preparation of the November 16, 1982 letter. On the present record those events cannot include the consultation with attorney Lemann.

The order of the district court overruling the motions to quash is AFFIRMED as to attorney Dwyer and REVERSED as to attorney Lemann.