IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 96-30545

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

T. WINDLE DYER,

Defendant-Appellant.

---

Appeal from the United States District Court for the
Eastern District of Louisiana

---

February 27, 1998

Before GARWOOD, DUHÉ and DeMOSS, Circuit Judges.

GARWOOD, Circuit Judge:

Defendant-appellant T. Windle Dyer (Dyer) appeals the district court's denial of his petition for a writ of *coram nobis*, challenging his 1984 guilty plea conviction for mail fraud contrary to 18 U.S.C. § 1341. We affirm.

**Facts and Proceedings Below**

On December 2, 1982, a federal grand jury returned a one-count indictment charging Dyer with extortion under the Hobbs Act, 18 U.S.C. § 1951. The indictment alleged that Dyer had extorted a payment of $25,000 as well as a financing commitment from a local real estate developer and banker. According to the indictment, Dyer had induced the unnamed victim to make a $25,000 payment and

to provide a letter of commitment to finance "Algiers Point," a development project proposed by Dyer. The indictment further alleged that this had been done "by the wrongful use of fear of economic loss and under color of official right." The gist of the alleged extortion was that Dyer used his position on the New Orleans City Planning Commission, as well as his purported influence with certain members of the New Orleans City Council, to extort money and a letter of commitment for Algiers Point by threatening to cause the City Council to reverse approval of the La Maison Charles project. Although the victim was not referred to by name in the indictment, the evidence before the grand jury reflected that Guy Olano (Olano), the developer behind the La Maison Charles project and chairman of the board at a local bank, was the alleged victim of Dyer's extortion.

In April of 1982, Olano and his partners had petitioned the City Council for a conditional zoning ordinance amendment to allow construction of the La Maison Charles timeshare project in New Orleans. After a public hearing on the matter, the Planning Commission unanimously voted at a meeting held on June 16, 1982, not to recommend Olano's proposal to the City Council. The June 16 vote occurred shortly before Dyer became a City Planning Commissioner. Soon thereafter, Dyer and Olano became acquainted and began negotiations regarding Olano's possible participation in the Algiers Point project, for which Dyer sought financing.

On July 21, 1982, Dyer attended his first Planning Commission meeting in his official capacity. At this meeting, the Commission

2

reconsidered the La Maison Charles proposal and, with Dyer voting, reversed its earlier decision and resolved to favorably recommend the proposal to the City Council. On August 5, 1982, the proposal was brought before the City Council, which approved it.

During this time, Dyer repeatedly told Olano that he had used his influence (and vote) as a City Planning Commissioner to assist passage of the La Maison Charles proposal. He also claimed to have used his influence to ensure a favorable vote in the City Council, and to have expended approximately $25,000 in doing so. Additionally, Dyer continued to negotiate with Olano, seeking to obtain financing from Olano that would allow him to buy out his current partner in the Algiers Point project, Charles Wall.[1]

In the ensuing months, Dyer allegedly began to demand "reimbursement" from Olano for the $25,000 that he claimed to have spent in influencing the votes on the La Maison Charles proposal. Dyer also allegedly began to pressure Olano to enter into a final agreement regarding the financing for his Algiers Point project. On November 2, 1982, Olano executed a letter of commitment for financing the Algiers Point project. The financing agreement anticipated the payment of an annual "management fee" to Dyer of $100,000. Dyer claimed that the $25,000 reimbursement that he requested was solely for the "out-of-pocket" expenses he had actually incurred in "lobbying" for approval of Olano's La Maison

---

[1] Olano was chairman of the board of directors of Alliance Federal Savings and Loan Association in Kenner, Louisiana, and, consequently was believed to be in a position to obtain financing for the project.

Charles project. Dyer also told Olano that he did not need any additional cash for himself, stating that Olano could "take care of him" both by means of the $100,000 management fee that was part of the financing deal for Algiers Point and by providing the financing itself.

In early November of 1982, Olano began cooperating with the FBI. Olano told law enforcement agents that Dyer was requesting substantial sums of money, purportedly to affect the outcome of votes both in the Planning Commission and in the City Council. The FBI began investigating Dyer, suspecting widespread corruption among New Orleans city officials. They came to believe that, in addition to accepting bribes in exchange for his own votes and political influence, Dyer might also be acting as a "bag man" on behalf of local politicians.

To obtain evidence of this suspected corruption, the FBI requested that Olano assist in the recording of both face-to-face and telephone conversations with Dyer. On November 8, 1982, Dyer and Olano met at the Plimsoll Club in New Orleans. During their conversation, which was recorded by Olano, Dyer repeated that he had expended $25,000 to assure passage of the La Maison Charles project and requested reimbursement in cash, explaining that it had been necessary to pay off certain public officials to ensure their votes. He told Olano that he had delivered the Planning Commission vote, but warned that the City Council might rescind their approval of the La Maison Charles project, unless he began to live up to his "obligations." However, Dyer assured Olano that if Olano paid him

4

$25,000 quickly (and in cash), and finalized an agreement for the financing of the Algiers Point project, that Dyer could ensure that a certain City Councilman would continue to support the proposal.[2]

The next day, November 9, 1982, Dyer reiterated the same representations and implicit threats in the course of several telephone conversations. Olano agreed to meet Dyer later that day at the Hyatt Regency Hotel in New Orleans. At the meeting, Dyer explained to Olano that he needed payment in cash because the individuals whom he needed to pay preferred dealing in cash. Olano told Dyer that he had not been able to get the entire $25,000 in currency, but that he had $5,000 in cash and a check for $20,000. Dyer accepted the money and the check, with the understanding that he would hold the check while Olano delivered the remaining $20,000 in cash over the next few days. Apparently Olano did not contact Dyer again for several days after the payment.

Six days later, on the evening of November 15, 1982, Dyer, accompanied by his civil attorney, Stephen Dwyer, approached Arthur Lemann, a New Orleans attorney who specialized in criminal law practice. The next day, Dyer caused a letter to be mailed under the signature of his civil lawyer, Dwyer, to Olano's office.[3] The

---

[2]

A transcript of this conversation was made a part of the record in the later criminal prosecution of Dyer and is a part of the record on this appeal. The transcripts of eight recordings of conversations between Dyer and Olano were submitted as evidence during Dyer's rearraignment and Rule 11 hearing. All of the conversations discussed herein are contained in the transcripts.

[3]

The record before us, including the written stipulation signed by Dyer and his attorney that was put in evidence at the hearing at

5

letter falsely stated that the $25,000 payment had been an advance of funds on the Algiers Point project, and was being returned by Dyer due to the expiration of Olano's letter of commitment regarding the financing of the project. On November 17, Dyer had a telephone conversation with Olano during which he told Olano that his demand for the money had merely been a "little test" to determine whether Olano was corruptible and to determine whether other local politicians were accepting bribes. Dyer commended Olano on seeming very reluctant to pay the money, and congratulated him for passing the test "with flying colors."

Approximately two weeks later, on December 2, 1982, Dyer was indicted under the Hobbs Act for extortion. A grand jury investigation continued after Dyer's initial indictment, and on April 3, 1983, the grand jury issued subpoenas to both of Dyer's attorneys, Lemann and Dwyer, calling them to testify before the grand jury regarding their interactions with Dyer subsequent to the November 15 meeting. The government also announced that it might seek a superseding indictment against Dyer to add one count of obstruction of justice in violation of 18 U.S.C. § 1512.[4]

---

which Dyer's plea to mail fraud was accepted and Dyer's sworn testimony at that hearing, reflect that the letter was mailed and that Dyer caused it to be mailed. Dyer has not and does not dispute that the letter was mailed and that he caused it to be mailed. However, in our opinion in *United States v. Dyer*, 722 F.2d 174 (5th Cir. 1983) (disposing of an appeal of the district court's pre-trial refusal to quash subpoenas while the Hobbs Act indictment was still pending), we stated that on "November 16, *Dwyer delivered* to Olano's office a letter which returned twenty-five thousand dollars." *Id.* at 176 (emphasis added).

[4]

*See United States v. Dyer*, 722 F.2d 174 (5th Cir. 1983).

Eventually, Dyer began negotiating a plea agreement with the government. Pursuant to the plea agreement, a superseding bill of information charging Dyer with one count of mail fraud was prepared. The information was based on essentially the same facts, related above, as the indictment for extortion. The government asserts, and Dyer does not dispute, that the substantive crime charged was changed from extortion to mail fraud to reduce Dyer's sentencing exposure from a maximum of twenty years to a maximum of only five.

At his rearraignment, Dyer waived his right to be charged by indictment and pleaded guilty to the one-count superseding information charging him with violation of section 1341, the mailing alleged being the November 16, 1982, letter. A letter formalizing the plea agreement and the FBI transcripts of the inculpatory conversations were received into evidence as was the written Rule 11 "statement of facts." The district court accepted Dyer's plea of guilty. On October 24, 1984, the district court sentenced Dyer to two year's incarceration, but suspended all but six months, which Dyer served at the Federal Prison Camp at Texarkana, Texas.

On June 24, 1987, the Supreme Court handed down *McNally v. United States*, 107 S.Ct. 2875 (1987), which held that the federal mail fraud statute under which Dyer was convicted did not encompass protection of the "intangible right of the citizenry to good government." *See id.* at 2879, 2882. Nearly nine years after *McNally*, in March of 1996, Dyer filed a petition for a writ of

7

*coram nobis*, requesting that his conviction be vacated. The sole argument presented in his petition is that under *McNally* the superseding bill of information failed to state a crime because it alleged a scheme to deprive the City of New Orleans and its citizens of the intangible right of "good government."

In the district court, the government argued that the bill of information stated an offense under *McNally* because it specifically identified Dyer's attempt to obtain the $25,000 and financing for the Algiers Point project as part of the charged fraudulent scheme. The government also argued that the writ should be denied on the basis of laches. It had been almost twelve years since Dyer had pleaded guilty to mail fraud, and he had waited until nearly nine years after *McNally* provided him with a colorable legal basis to attack his conviction before finally choosing to do so. The government asserted that it would be prejudiced by this delay if it chose to retry Dyer, specifically alleging that many of the files from the thirteen-year-old investigation had been "scrubbed"; that the FBI agents who had worked on the case could not easily be located, some of them having retired and others having transferred; and that three of the government's key witnesses, including Olano, had been convicted subsequent to Dyer's conviction and would very likely be unwilling to testify on behalf of the government. Neither Dyer nor his attorney attempted to explain the delay, nor did they dispute the government's specific factual assertions regarding the prejudicial nature of the delay. Dyer's only response was that the government had no "legitimate" interest in

8

retrying him because he had already served his time.

In a brief opinion, the district court held that the superseding bill of information sufficiently stated an offense under *McNally* because it alleged a specific property deprivation. Accordingly, it denied Dyer's petition for the writ.[5] Dyer has timely appealed to this Court.

## Discussion

### I. The Writ of *Coram Nobis*

In 1954, the Supreme Court's decision in *United States v. Morgan*, 74 S.Ct. 247, revived the ancient writ of *coram nobis* by holding that the writ was available in federal courts pursuant to the All Writs Act, 28 U.S.C. § 1651(a).[6] Since that time the writ has been used as an avenue of collateral attack when the petitioner has completed his sentence and is no longer "in custody" for purposes of seeking relief under either 28 U.S.C. § 2241 or § 2255.

In *Morgan*, the Court emphasized that the writ of *coram nobis* could not be used as a substitute for appeal and should only be employed to correct errors "of the most fundamental character." *Morgan*, 74 S.Ct. at 253 (citing *United States v. Mayer*, 35 S.Ct.

---

[5]

Because the district court found the superseding bill of information to state an offense under *McNally*, it found it unnecessary to rule on the government's laches argument. Additionally, the district court does not appear to respond to the argument that Dyer presented orally regarding the sufficiency of the mailing charged.

[6]

Section 1651(a) provides: "The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."

16, 19 (1914)). The Court further admonished that "[c]ontinuation of litigation after final judgment and exhaustion or waiver of any statutory right of review should be allowed through this extraordinary remedy only under circumstances compelling such action to achieve justice." *Id.* at 252. The writ will issue only when no other remedy is available and when "sound reasons exist[] for failure to seek appropriate earlier relief." *Id.* at 253. In addition, a petitioner bears the considerable burden of overcoming the presumption that previous judicial proceedings were correct. *Id.*

We note the special nature of the writ to explain the context of our discussion below. While Dyer points to asserted errors that might warrant more extensive treatment on direct appeal, they fall short of the class of "fundamental" errors that merit remedy through issuance of a writ of *coram nobis*. He also has failed to demonstrate "circumstances compelling such action to achieve justice." Moreover, he has failed to allege with any specificity what lingering civil disabilities he continues to suffer as a result of his 1984 mail fraud conviction. The demonstration of such disabilities is one of the most significant factors in determining whether sufficiently "compelling circumstances" exist and is often a prerequisite to *coram nobis* relief. As we repeatedly have stated, "*Coram nobis* is appropriate only where the petitioner *can demonstrate* that he is suffering civil disabilities as a consequence of the criminal convictions" that are being

10

collaterally attacked.[7]   We also emphasize that our review is limited by the presumption of correctness of prior proceedings and the narrow range of claims cognizable in granting the remedy sought by Dyer.

II.  Dyer's Claims of Error

Dyer raises essentially three issues on appeal.  First, he makes a half-hearted argument that the information fails to state a fraudulent use of the mails, asserting parenthetically that "it is doubtful that the information in this case could have ever charged a mail fraud scheme with Olano as the victim since the only mailing involved here was one *returning* the money to Olano." Second, Dyer asserts that his conviction was based solely on the "intangible rights" theory of fraud that was invalidated by *McNally* and must therefore be vacated.   Third, Dyer responds to the government's argument that his petition should be denied on the basis of laches.

A.  The Mailing

Although Dyer mentions the sufficiency of the mailing only "parenthetically" in his brief on appeal, he argued the issue orally before the lower court, so we briefly address this claim.

---

[7]

*United States v. Marcello*, 876 F.2d 1147, 1154 (5th Cir. 1989) (emphasis added).  *See also United States v. Bruno*, 903 F.2d 393, 396 (5th Cir. 1990) (remanding with instructions to issue a writ of *coram nobis* only upon demonstration of continuing civil disabilities); *Cline v. United States*, 453 F.2d 873, 874 (5th Cir. 1972) (holding that petitioner had failed to demonstrate the requisite "compelling circumstances" because writ of *coram nobis* would not "afford Petitioner any relief" from alleged civil disabilities).

One of the elements of the offense of mail fraud is that the defendant cause the mails to be used "for the purpose of executing [the] scheme or artifice" to defraud or in "attempting so to do." Section 1431. It is often stated that the mailing must be "in furtherance of" the scheme to defraud.[8] It does not, however, have to constitute a central or essential element of the scheme.[9] As Dyer has argued, the mailing in this case facilitated the return of the money to Olano, and, consequently, there is some difficulty in categorizing the mailing as having been "in furtherance of" a scheme to defraud. Because Dyer does not press this argument on appeal—failing to cite a single case in his favor and expending only one complete sentence in addressing the issue—we do not pause to consider it at great length. The letter made false representations and was intended to decrease the likelihood of discovery and prosecution. The mailing at issue thus arguably falls within the outer boundary described by the Supreme Court in *United States v. Lane*, 106 S.Ct. 725, 733 (1986), and *United States v. Sampson*, 83 S.Ct. 173 (1962). Furthermore, it is not clear

---

[8] *See, e.g., McNally v. United States*, 107 S.Ct. 2875, 2881 (1987) ("We believe that Congress' intent in passing the mail fraud statute was to prevent the use of the mails in furtherance of such [fraudulent] schemes.").

[9] For example, a mailing is sufficient if it is "designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make apprehension of the defendants less likely than if no mailings had taken place." *United States v. Lane*, 106 S.Ct. 725, 733 (1986) (quoting *United States v. Maze*, 94 S.Ct. 645, 650 (1974)). It is also sufficient if it is intended to "facilitate concealment of the scheme." *Id.* at 734.

that Dyer's scheme had ended at the time of the mailing. The record contains some evidence tending to indicate that Dyer still expected Olano to participate in the financing of Algiers Point after the return of the money. As discussed above, both the financing itself and the $100,000 annual "management fee" were alleged in the information to be objects of the charged scheme. Dyer does not assert, and the record does not unambiguously indicate, that the challenged mailing occurred after completion of the scheme alleged in the bill of information. Consequently, we hold that even if Dyer has preserved this issue on the present appeal, he has not shown with the clarity requisite for *coram nobis* relief that the mailing is insufficient.[10] Hence he is not entitled to relief on that basis.

B. Sufficiency of the Bill of Information

---

[10] Even assuming, *arguendo*, that we would hold the mailing insufficient if presented to us on direct review of a jury verdict, we are less inclined to do so here. By pleading guilty a defendant waives all nonjurisdictional defects in the prior proceedings. *United States v. Miramontez*, 995 F.2d 56, 60 (5th Cir. 1993); *United States v. Diaz*, 733 F.2d 371, 376 (5th Cir.1984) ("[A] valid guilty plea waives all nonjurisdictional defects in the proceedings against a defendant."). *See also O'Leary v. United States*, 856 F.2d 1142 (8th Cir. 1988) (stating that because all nonjurisdictional errors are waived by a plea of guilty, a mailing is sufficient if the charging instrument on its face states that the mailing was in furtherance of the charged scheme). We also note that failure to broadly review the mailing issue does not result in any fundamental injustice to Dyer. He was charged with a superseding bill of information which could have been amended at any time to substitute another use of the mails. *See United States v. Prince*, 868 F.2d 1379, 1384 (5th Cir. 1989). The record on appeal indicates that the mails were used during negotiations regarding the Algiers Point project. Any one of these mailings likely would have been sufficiently "in furtherance of" the part of the scheme to obtain financing for Algiers Point and could have been easily substituted for the mailing in question.

Dyer's second argument is that his conviction was based "solely" on an intangible rights theory that was invalidated by *McNally*. He asserts that the district court misapplied both *McNally* and the law of this Circuit in holding that the information sufficiently stated the offense of mail fraud. Moreover, Dyer claims that the case at bar is factually "indistinguishable" from *United States v. Marcello*, 876 F.2d 1147 (5th Cir. 1989), in which we applied *McNally* retroactively, granting one of the petitioners a writ of *coram nobis* and granting the other relief under 28 U.S.C. § 2255. We first consider Dyer's specific claim that *Marcello* dictates reversal of the lower court's decision, and we then proceed to address Dyer's more general claim that his information failed to state an offense under *McNally*.

*Marcello* involved two petitioners who collaterally attacked their mail fraud convictions pursuant to *McNally*, arguing that their indictments failed to state an offense because they were charged solely on an intangible rights theory. *Marcello*, 876 F.2d at 1149-50. One of the two, Roemer, had completed his sentence, so his only remedy lay in seeking a writ of *coram nobis*. Roemer was charged by indictment and convicted by a jury. *Id.* at 1151. The "indictment contain[ed] no property interest allegation whatever." *Id.* The prosecution described the scheme to the jury as one to defraud citizens "of their right to the honest and faithful services of their elected and appointed officials," and the evidence presented at trial was relevant to bribery and other deprivations of the "right to honest and faithful service" of

14

public officials. *Id.* at 1152. The jury instructions allowed conviction upon an intangible rights theory. *Id.* We concluded that the facts of the case "impel[ed] the conclusion that the intangible rights theory was the *sole basis* on which the jury could have convicted the defendants." *Id.* at 1150-51 (emphasis added). Roemer had exhausted the remedies available to him on direct appeal and "sought [collateral] relief promptly after *McNally.*" *Id.* at 1154. And, finally, in *Marcello* the government did not "challenge the propriety" of *coram nobis*, and treated Roemer's appeal as if he were seeking relief under section 2255. *Id.*

In sharp contrast, Dyer was charged by a superseding bill of information drafted pursuant to a plea agreement.[11] The information contained specific allegations of both money and property loss. Dyer pleaded guilty before a judge to whom was presented a "statement of facts" that reflected, *inter alia*, Dyer's scheme to deprive Olano of both money and property within the meaning of *McNally*.[12] Dyer, under oath, admitted in open court that the

---

[11]

The relevance of the distinction between grand jury indictments and bills of information is explained in more detail below in our discussion of the *Prince* case.

[12]

In this case, there was *no* reference to the intangible rights doctrine in the Rule 11 hearing, either by the court or either of the parties. The transcript also reflects that in defining the elements of mail fraud the court stated: "The words, scheme and artifice, as I've used them, include a plan or course of action intended to deceived others, and to obtain by false or fraudulent pretenses, representations or promises *money or property* from a person so deceived." (emphasis added). The court's use of the phrase "money or property" was without any accompanying explanation that the right to honest government can constitute property.

15

statement of facts was accurate. Prior to sentencing, Dyer provided the trial court with written testimony claiming that he was *not* guilty of corruption and denying that he had deprived the City of honest government, but admitting that he had obtained money from Olano by means of fraudulent representations.[13] Dyer did not challenge the sufficiency of the information in the trial court, nor did he pursue an appeal. He did not seek relief promptly after the *McNally* decision gave him a colorable basis to do so, waiting almost nine years before instituting the instant proceeding. Dyer does not allege, nor did he offer proof of, any specific lingering civil disability caused by his conviction.[14] And finally, the

---

[13]

We have held that evidence adduced after the acceptance of a guilty plea, but before or at sentencing, may provide the factual basis of the plea, and that such evidence may be sufficient to sustain a plea on direct appeal. *United States v. Gulledge*, 491 F.2d 679 (5th Cir. 1974). Dyer's statements in his affidavit in aid of sentencing and the statements that he made to the probation officer preparing his presentence report constitute circumstantial evidence of the factual basis upon which the district court relied in accepting the plea, as well as Dyer's subjective belief regarding the offense with which he was charged and the factual basis for his plea. The inferences fairly drawn from Dyer's statements reflect that Dyer either believed, and/or sought to have the court believe, that he was free from any taint of governmental corruption, but that he had, in the course of his dealings with Olano, committed mail fraud.

[14]

Dyer's petition for *coram nobis* relief, his supporting memorandum, and reply memorandum make no mention whatever—general or specific—of any lingering civil disability due to the conviction. It appears that Dyer's *only* mention of civil disabilities in the court below is found in his separately filed, one-page request for oral argument on the motion, which contained only the conclusory allegation that "he continues to suffer significant civil disabilities to this day." There was no mention of disabilities at the oral argument before the district court. And the record does not reflect any specific lingering disability, or what, if any, effect Dyer's 1984 conviction has on him today or had on him when

16

government vehemently challenges the propriety of the writ as to Dyer on both legal and equitable bases. In sum, not only are the facts in the case *sub judice* not, as Dyer claims, virtually indistinguishable from those in *Marcello*, but a comparison of the two cases reveals several distinguishing factors that strongly militate against issuance of a writ of *coram nobis*.

Dyer also makes a general argument attacking the sufficiency of the superseding bill of information in his case, claiming that it failed to state an offense under *McNally*. In *United States v. Prince*, 868 F.2d 1379 (5th Cir. 1989), we articulated the standard under which the sufficiency of a charging instrument is evaluated in a collateral attack. In that case we stated that:

> "'[T]he sufficiency of an indictment or information is not open to collateral attack after conviction unless it appears that the circumstances are exceptional, that the questions raised are of "large importance," that the need for the remedy sought is apparent, and that the offense charged was one of which the sentencing court manifestly had no jurisdiction.'" *Id.* at 1384 (quoting *Merrill v. United States*, 599 F.2d 240, 242 (8th Cir. 1979)).

We also distinguished the appropriate treatment on review of indictments from that of bills of information on the basis that when a defendant points out a defect in a bill of information, "the prosecution [can] easily amend[] it without sending it back to the grand jury." *Id.* Finally, we held that delay in seeking a remedy weighed heavily against the petitioner, stating that the "tardier the challenge, the more liberally and aggressively have indictments been construed so as to save them." *Id.* (citing *United States v.*

---

the writ was filed in 1996.

17

*Richardson*, 687 F.2d 952, 962 (7th Cir. 1982)).

In the case at bar, Dyer was charged by means of a superseding bill of information. The charging instrument was prepared in the context of a negotiated plea agreement. The record reflects that both Dyer and his counsel had reviewed the information prior to Dyer's plea and could easily have requested any technical changes necessary. In addition, as discussed above, Dyer has delayed bringing this collateral attack on his conviction for nearly a decade. Consequently, under the various rationales articulated in *Prince*, and the cases cited therein, we proceed to construe the challenged information liberally and will uphold its sufficiency if by any reasonable construction it can be said to charge an offense. *See id.* at 1384. Such an approach is especially appropriate where the sentence was completed a decade before relief is first sought and no specific disabilities are alleged.

In his brief, Dyer argues that the information was fatally defective under *McNally* because "[t]he information alleged that the citizens and the City of New Orleans were the victims of Dyer's scheme, not Olano." He further asserts that the information contained no allegation that he deprived the City of money or property, and concludes that because he "was only charged with defrauding the victims of their intangible right to '*good government*,' his conviction is invalid." (emphasis in original).

It is true that Dyer's bill of information does not mention Olano by name, and that it does contain "intangible rights" language. However, the only scheme to defraud charged in the

18

information is described in three paragraphs, each of which implicates Olano as either the victim of Dyer's fraud or as having received the benefits of bribing Dyer.[15]  As the Seventh Circuit stated in a similar case, "[t]he legal characterization the indictment places on the scheme should not obscure the fact that the specific conduct alleged in the indictment is clearly proscribed by the mail fraud statute."  *United States v. Wellman*, 830 F.2d 1453, 1463 (7th Cir. 1987).  The court continued, "[i]n sum, we believe that *McNally* prescribes more than a rule of

---

[15]

The scheme charged in Dyer's information is described exclusively in three paragraphs, which read as follows:

> "1.   It was part of the scheme and artifice to defraud the City of New Orleans and its citizens that the defendant, T. WINDLE DYER, did use his position as an appointed member of the New Orleans City Planning Commission to promote the recommendation of and the passage of a time-share proposal for La Maison Charles before the City Planning Commission and the New Orleans City Council by seeking to influence members of those government bodies, while at all times intending to receive a future personal financial benefit as a result of this support in the form of financing of the Algiers Point project which included the payment of a $100,000 management fee.
> 2.   It was a further part of the said scheme and artifice to defraud that the defendant did demand that the developer of La Maison Charles pay Dyer $25,000 allegedly for reimbursement of funds expended to assure passage of the time-share proposal.
> 3.   It was a further part of the said scheme and artifice to defraud that the defendant did threaten to use his position as a City Planning Commissioner and his influence with a New Orleans City Councilman to prevent final ratification of the La Maison Charles time-share ordinance with provisos unless the developer of La Maison Charles paid the $25,000 in cash and finalized plans for the financing of the Algiers Point project."

As discussed below, prior to sentencing Dyer denied under oath the allegations in paragraph one, and consequently we infer that the allegations in paragraphs two and three provided the factual basis for his conviction.

19

pleading." *Id.* And as Judge Easterbrook replied to a similar contention in *United States v. Keane*, 852 F.2d 199 (7th Cir. 1988), "the mail fraud statute proscribes fraudulent *schemes*" and "does not limit the category of victims."[16] *Id.* at 205 (emphasis in original).

Dyer's admitted conduct toward Olano evinced a clear intention to deprive Olano of both money and property by means of false representations, falling well within the range of fraudulent schemes punishable under the mail fraud statute after *McNally*.[17] Furthermore, as discussed above, the conduct described in the information had initially served as the basis for an indictment charging Dyer with having extorted Olano. In light of the foregoing, we are unpersuaded by the assertion that the information did not contemplate Olano as a victim, or one of the victims, of

---

[16]

With regard to the sufficiency of the charging instrument in that case, the court went on to state that, although it was "phrased in terms of intangible rights to honest services, the indictment notified Keane of [the relevant] aspects of the scheme," and the court held the indictment sufficient. *Id.* Similarly, here the bill of information was more than sufficient to put Dyer on notice that the or an object of the alleged fraud was to deprive Olano of money and property.

[17]

*McNally* noted that "fraud" had traditionally referred to "'wronging one in his property rights by dishonest methods or schemes,'" and that to defraud "'usually signif[ies] the deprivation of something of value by trick, deceit, chicane or overreaching.'" 107 S.Ct. at 2881 (citations omitted). The alleged scheme falls squarely within the *McNally* definition of fraud. Dyer admits that he tricked Olano out of the money by means of deceit (*i.e.*, his false representations that he had used money to affect the outcome of the City Council and Planning Commission votes).

20

the fraudulent scheme.[18]

With regard to Dyer's assertion that he was convicted "solely" on an intangible rights theory, we observe that in the affidavit he submitted to the trial court prior to sentencing he specifically stated that the representations he had made to Olano were false and were made with the intent to cause Olano to pay him the $25,000 and to commit to financing Algiers Point. He further claimed therein that he had never compromised the integrity of the City's governmental processes. As of sentencing, the *only* criminal behavior to which Dyer had admitted was that of fraudulently obtaining money (and attempting to obtain development financing) from Olano.[19]

Given Dyer's sworn assertions to the court that he had not deprived the City of New Orleans of the intangible right of good

_____

[18]

We also note that the substantive crime charged in the superseding information was obviously changed to mail fraud pursuant to the plea negotiations to reduce Dyer's maximum sentencing liability from twenty years to five years, and that although Dyer's original indictment did not refer to Olano by name, it was clear he was the intended victim.

[19]

In his affidavit Dyer states: "I never spent a penny on behalf of the La Maison Charles time share project, I had no influence with [City Councilman] John Singleton, [and] I never sought to influence the councilman." He characterizes his dealings with Olano as a mere "charade," and states that "anger and frustration" led him "to play out a scenario for Olano which had *absolutely no basis in fact* -- I reminded him of the $25,000 he had committed to pay and I suggested that . . . I had expended funds in excess of this amount in securing the La Maison Charles zoning amendment and, moreover, that in some way I could influence [Councilman] Jim Singleton's position on this issue." (emphasis added). Near the end of the affidavit, he asserts that "while I suggested to Guy Olano that I had engaged in certain illegal conduct on behalf of La Maison Charles *I had not done so*." (emphasis in original).

21

government, and that he had not engaged in *any* illegal conduct in connection with his involvement in local government, we fail to see how the trial court could have accepted Dyer's plea, convicted him, and sentenced him on any factual basis not involving a scheme to defraud Olano within the meaning of *McNally*. In the Rule 11 hearing, the court did not once mention the City of New Orleans as the victim or use "intangible rights" language in describing the charged offense.[20] While under other circumstances, and in a different procedural context, we might find arguable merit in Dyer's contention that the information was so flawed as to require invalidation of his conviction,[21] in the present context and

---

[20]

Dyer bears a "heavy burden" in seeking to overcoming the strong presumption of the regularity of prior proceedings. *Marcello v. United States*, 328 F.2d 961, 963 (5th Cir. 1964). As we stated in that case, on appeal the court appropriately considers all credible evidence, including, *inter alia*, "the parole report, the judgment and commitment, and [relevant] testimony." *Id.* Pursuant to Rule 11(f) of the Federal Rules of Criminal Procedure, notwithstanding a plea of guilty, a district court should not enter judgment upon that plea without ensuring that there is a sufficient factual basis for it. In Dyer's case, the court had accepted the plea but had not entered judgment when Dyer submitted an affidavit in which he denied one of the two factual scenarios upon which he could have been convicted. He absolutely denied participation in any form of governmental corruption, while admitting that he made false representations to Olano with the intent to obtain money and a financing commitment from him. In statements provided for preparation of the presentence report, he also specifically denied any extortion occurred and admitted mail fraud. We assume that the district court would not have proceeded to enter judgment in the face of what amounts to a claim of innocence regarding the allegations of corruption, or would have at least treated Dyer's affidavit as a motion to withdraw his plea, unless it was satisfied that the alternative factual scenario, which necessarily implicated fraud with Olano as a victim, provided a sufficient factual basis for the plea.

[21]

For example, if the conviction had been obtained pursuant to a jury

22

circumstances we hold that the information sufficiently stated an offense under *McNally* and that, given the facts adduced in the Rule 11 statement and the explicit admissions made in Dyer's affidavit to the court, his plea was valid and adequately supported by record evidence.

## III. General and Equitable Requirements

In light of Dyer's assertion that our reasoning and analysis in *Marcello* essentially mandated the relief he sought, we pause briefly to reiterate and emphasize two general requisites to *coram nobis* relief, neither of which Dyer has met.

### A. Inexcusable and Unexplained Delay

In *Marcello,* the petitioner brought his collateral attack promptly after *McNally,* and the government did not challenge the propriety of the use of the writ. *Marcello*, 876 F.2d at 1153-54. In contrast, Dyer waited an extremely long time to bring his suit, and the government emphatically urged the bar of laches in the district court and reasserts on appeal that Dyer's petition should be barred by laches. It has long been recognized that a petitioner seeking *coram nobis* must exercise "reasonable diligence" in seeking prompt relief.[22] Because we may affirm the judgment of the district

---

trial rather than a plea arrangement, and there had not been a prior indictment in which Olano was alleged to be the victim of Dyer's extortion, and the case were before us as a direct appeal rather than as a long-delayed collateral attack, there is a possibility that we would be more receptive to Dyer's legal arguments.

[22]

*See, e.g., United States v. Morgan*, 74 S.Ct. 247, 253 (1954) (requiring "sound reasons" for a petitioner's "failure to seek appropriate earlier relief")*; Telink, Inc. v. United States*, 24

court on any basis that was presented in the lower court, and because both parties have briefed the laches issue, we address it.

In the district court, the government made facially reasonable assertions explaining how Dyer's delay would prejudice any attempt to retry him on the original charges. Dyer did not, and has not, attempted to explain the delay.[23] On appeal, the government reasserts that it would be significantly prejudiced in retrying Dyer, again making the plausible, facially reasonable assertions that many of the relevant files have been "scrubbed" in the intervening time period,[24] that the FBI agents who investigated Dyer in November of 1982 would be difficult, perhaps impossible, to

_____

F.3d 42, 47 (9th Cir. 1994) ("In requiring reasonable diligence at all times, our holding ensures a petitioner will not use an analogous limitations period as a safe haven for prejudicing the government, willfully delaying the assertion of his or her rights and then raising the claim after the inexcusable delay has impaired the government's ability to respond to the allegations or to proceed to retrial."); *United States v. Darnell*, 716 F.2d 479, 481 n.5 (7th Cir. 1983) ("The doctrine of laches adequately protects against 'sandbagging' and ensures that *coram nobis* relief will not be granted where a petitioner's inexcusable delay in raising his claim has prejudiced the government.").

[23]

Before the district court, Dyer's counsel essentially conceded that no reasonable explanation for the delay had been presented (or would be forthcoming), stating that "[U]nquestionably Dyer waited a long, long time. Why, I don't know. He's not a lawyer. That's all I can tell the Court. He's not a lawyer. He waited a long, long time."

[24]

The attorney for the government emphasized that almost thirteen years had passed since the original investigation. He further stated that "the files that I have got . . . have been scrubbed as a result of the procedures that we used, . . . ."

24

locate,[25] and that, because three of the government's principal witnesses have since been convicted and incarcerated, they would very likely be unwilling or unhelpful witnesses.[26]  Dyer did not dispute any of these assertions in the lower court, nor does he do so now.  Instead, he attempts, as he did below, to counter the government's laches argument solely by asserting that the government has no "legitimate" interest in retrying him because he has already completed his sentence.  He further argues that because he "has already been punished for his conduct, the government

---

[25]

The government's attorney explained to the district court that many of the FBI agents who conducted the surveillance in the original investigation had been transferred or had retired and would be difficult to locate.  In its brief, the government reasserted this difficulty stating that "many of the government agent witnesses will be difficult, if not impossible, to locate, having either moved to other offices or retired from the FBI."  Moreover, considering the amount of time that has elapsed, even if they were found and gathered to testify at trial, their memories of the investigation would undoubtably have faded somewhat in the intervening decade.

[26]

In its appellee's brief, the government asserts that "[e]ven more prejudicial [than the difficulty of locating the original investigating FBI agents] is the fact that three of the government's potential witnesses were subsequently prosecuted by the government, convicted, and have no interest in testifying on behalf of the government or remembering events of the distant past."  The government's attorney explained this in more detail before the district court, stating that "[t]hree of my witnesses, because this [Dyer's extortion prosecution] was abandoned, have now been prosecuted and found guilty of felonies since that situation, and I'm responsible for [the prosecution] of two of those guys," one of whom, Olano, "is serving eighteen years."  Under the circumstances, the government is understandably skeptical about the both the willingness and the ability of these witnesses to recall the events of November 1982.

cannot now seek to incarcerate him for a second time."[27]

Dyer's argument is both unavailing and incorrect as a matter of law. Dyer could be lawfully retried.[28] And, if he were convicted, an increased penalty could be legitimately and lawfully imposed, although he would receive credit for the time he had already served.[29] Moreover, Dyer's argument that the policies underlying double jeopardy jurisprudence indicate that any "legitimate" governmental interest in retrying him was essentially extinguished upon the completion of his original sentence is simply

---

[27]

Similarly, in oral argument before the district court, Dyer's counsel answered the government's prejudice argument solely by asking the court to assume that the government would not in fact choose to retry Dyer if his conviction were vacated, calling the government's assertion that it would retry Dyer "empty hollow threats," arguing that the government "could not justify retrying this man [Dyer]" because "they couldn't give him any more punishment" than was imposed pursuant to the original conviction, and asserting that "the government has one simple lingering interest in this case, and that is to continue to brand this man as a felon for conduct that is not a felony." Dyer made no written response below to the government's plea of laches.

[28]

We have specifically held that double jeopardy does not bar retrial of individuals whose mail fraud convictions have been set aside pursuant to *McNally*. *See, e.g., United States v. Miller*, 952 F.2d 866 (5th Cir. 1992). *See also United States v. Italiano*, 894 F.2d 1280 (11th Cir. 1990) (allowing retrial of defendant whose initial conviction had been overturned pursuant to *McNally*). In *Italiano*, the court held that a superseding indictment based on the same underlying facts could be brought pursuant to 18 U.S.C. § 3288, which allows a new indictment to be brought within six months of the dismissal of an earlier indictment irrespective of the original statute of limitations.

[29]

If a plea of guilty is withdrawn, or a plea agreement is abrogated, double jeopardy principles do not proscribe the imposition of a harsher punishment if the defendant is reconvicted. *See, e.g., Alabama v. Smith*, 109 S.Ct. 2201 (1989).

26

incorrect. The government has a strong and legitimate interest both in the finality of convictions[30] and in the enforcement of plea bargains.[31]

Here we are faced with nearly a decade of unjustified delay. The government has consistently made facially plausible factual assertions regarding resulting prejudice both in the district court and in this Court. Dyer has failed ever even to dispute the factual assertions of prejudice made by the government and has offered absolutely no explanation for his delay in seeking collateral relief. He has not asserted that the government should be put to its proof on this score. His *only* answer to the government's facially reasonable assertions—that policy considerations weigh against the recognition of the "legitimacy" of any interest the government may have in retrying him—is without legal merit. In this posture, laches may properly bar relief. *Cf. Telink, Inc. v. United States*, 24 F.3d 42, 47 (9th Cir. 1994).[32]

---

[30]

Emphasizing the importance of finality, the Supreme Court stated in *Morgan*, 74 S.Ct. at 252, that the "[c]ontinuation of litigation after final judgment and exhaustion or waiver of any statutory right of review should be allowed through this extraordinary remedy only under circumstances compelling such action to achieve justice."

[31]

In recognition of the mutual benefits yielded by plea bargains and their enforcement, the Supreme Court has upheld the practice of providing for a lenient sentence to induce a plea bargain, as well as the practice of threatening increased or additional charges if a defendant does not enter into a plea agreement. *Alabama v. Smith,* 109 S.Ct. 2201, 2206 (1989). *See also Bordenkircher v. Hayes*, 98 S.Ct. 663, 667 (1978).

[32]

We pause to note that with respect to *habeas corpus* petitions, we

27

B.  Lingering Civil Disabilities

Dyer has failed to allege *any* specific lingering civil disability resulting from his mail fraud conviction, despite our statement in *Marcello* that *coram nobis* "is appropriate only where the petitioner can demonstrate that he is suffering civil disabilities as a consequence of the criminal convictions." *Marcello*, 876 F.2d at 1154.  As noted above, Dyer has failed even to hint what adverse collateral consequences of his conviction might support the relief he seeks.

We have indicated in past cases that we will generally not presume that the collateral consequences of a prior conviction are sufficiently substantial to demonstrate the "compelling circumstances" that warrant *coram nobis* relief.[33]  Dyer has failed

have held that "no matter how long after conviction a petition is filed it may not be dismissed [under Rule 9(a)] absent a particularized showing of prejudice."  *Marks v. Estelle*, 691 F.2d 730, 732 (5th Cir. 1982).  *Marks*, however, was a habeas case.  This is a *coram nobis* case in which liberty has never been at stake, and no specific continuing disability has been asserted, and we have undenied, facially plausible, factual assertions of prejudice resulting from facially unreasonable extreme delay, the only response to which has been the contention that there is no legally legitimate interest in retrial.  *Marks* does not dictate the result in this sort of *coram nobis* setting.

[33]

*See, e.g., Cline v. United States*, 453 F.2d 873, 874 (5th Cir. 1972) (holding the alleged collateral consequences of a prior conviction insufficient to demonstrate the "compelling circumstances" that would "justify resort to this extraordinary remedy [of *coram nobis*] in order to achieve justice").  *See also United States v. Hay*, 702 F.2d 572, 574 (5th Cir. 1983) ("On direct appeal we declined to speculate as to any adverse effect [from petitioner's previous conviction]; we decline to do so now [in a collateral proceeding].");  *Rodgers v. United States*, 451 F.2d 562, 564 (5th Cir. 1971) (per curiam denial of rehearing) (conceding that collateral consequences almost inevitably flow from criminal convictions, but stating that "th[is] fact alone is not enough to

to inform the district court or this Court of *any* particular lingering civil disability that would support the issuance of a writ of *coram nobis*. Having refused to presume the existence of the requisite substantial adverse collateral consequences in past cases, we decline to do so here.

## Conclusion

In conclusion, we take cognizance of the Supreme Court's admonition in *Morgan*, which we again emphasized in *Marcello*, that "*coram nobis* should issue to correct only errors which result in a complete miscarriage of justice," 876 F.2d at 1154. Dyer has stated under oath to the district court prior to sentencing that he knowingly and intentionally defrauded Olano of money and obtained financing obligations from him by making false representations. He stated in an affidavit directed to the court that he had not, however, engaged in defrauding the citizens or City of New Orleans of their right to honest services, but had merely misrepresented to Olano that he had done so. He repeated these assertions to the probation officer who prepared his presentencing report. Accordingly, contrary to his present contention, Dyer's conviction has not been demonstrated to rest on a basis repudiated by *McNally*.

In addition, we note that Dyer has failed to meet several of the equitable requirements that we have imposed upon petitioners who request the "extraordinary remedy" of *coram nobis*. Dyer did

---

justify issuance of an extraordinary writ of coram nobis."). *Cf. United States v. Bruno*, 903 F.2d 393, 396 (5th Cir. 1990) (remanding case for "a determination regarding the existence of substantial adverse collateral consequences" with instructions that *coram nobis* relief be granted only upon such showing).

29

not act with reasonable diligence in seeking relief, he has not alleged any specific lingering civil disabilities caused by his conviction, and he has not shown that denial of the writ would cause a miscarriage of justice.

In our view, the combination of these factors mandates withholding the writ. Dyer has not demonstrated that justice demands issuance of the writ. The district court's denial of the petition for a writ of *coram nobis* is therefore

AFFIRMED.